THE NORTH GEORGIA MINING COMPANY, plaintiff in error *vs.* CHARLES LATIMER, defendant in error.

1. On the trial of an issue arising upon a contract entered into between A of the one part and B, C, D, E and F of the other part, all the parties being present and engaged in fixing the terms, A is not an incompetent witness because one of the parties of the other part has since died.

2. When one owning a tract of land supposed to contain minerals entered into a contract with another, in which it was stipulated that the other might enter upon the land, and test it at his own expense, and should the land contain the mineral (copper) as hoped for, the person testing should have the right to buy, at a fixed price, if the mine was equal in value to the Ducktown mines, the price to rise or fall accordingly as the mine was better or less valuable than said mines, and the testing was made and a valuable mine found, believed by the parties to be equal to the Ducktown mines, and the parties thereupon formed a joint stock company, the owner of the land taking one-fourth of the stock in full discharge of the amount agreed to be paid him:

*Held,* that in considering whether the consideration agreed to by the owner of the land, to-wit: one-fourth of the stock, was a fair and adequate consideration, the cost of testing, together with the risk of losing the whole expenditure in case of failure, was the test of the consideration paid by the person testing, and if that was equal, under the circumstances, to three-fourths of the value, the consideration was fair and adequate.

3. On a bill filed for specific performance, if the contract be in writing, is fair and just in all its parts, is certain and for an adequate consideration, and capable of being performed, it is as much a matter of course for a court of equity to decree a specific performance as it is for a court of law to give damages for it in other cases, and it was error in the judge to refuse to charge this as the law, in a case where the contract was in writing, and under the evidence it was competent for the jury to have found the contract, fair, just, certain, for an adequate consideration, and capable of being performed.

WARNER, Chief Justice, dissented.

Witness. Contracts. Consideration. Equity. Specific performance.    Before Judge HOPKINS.    Fulton Superior Court. April Term, 1873.

The North Georgia Mining Company filed its bill against Charles Latimer, making, substantially, the following case:

The defendant, being the owner of lot of land number twenty, in the ninth district of the second section of originally Cherokee, now Fannin county, supposed to contain valuable

mineral deposits, leased the same, with a conditional right of purchase, to R. G. A. Love and William Johnston, of the State of North Carolina, on March 17th, 1854, and said lessees, on the 17th day of the succeeding June, sold their said lease and contract of purchase to Edward M. Gault and Benjamin Johnston, who afterwards became associated with Nimrod S. Jarrett in testing said property, by which said Love and Johnston reserved to themselves one-fourth interest therein for the expense of testing the same. Gault, Johnston and Jarrett having discovered a vein of copper on said property, which was considered valuable, and being desirous of fulfilling their contract to pay for the same, to-wit: on January 22d, 1856, proposed to the other parties interested, to-wit: the defendant, R. G. A. Love and William Johnston, the formation of a joint stock company, which proposition was accepted, and the following agreement entered into :

"DALTON, STATE OF GEORGIA, January 22d, 1856.

"Whereas, on the 17th of March, 1854, R. G. A. Love and William Johnston, of North Carolina, obtained from Charles Latimer, of DeKalb county, in the State aforesaid, a lease, with a condition of purchase, on a lot of land lying and being in the ninth district and second section of originally Cherokee, now Fannin county, Georgia, being lot number twenty, and supposed to contain minerals of value; and whereas, on the 17th day of June following the date of said instrument, the said R. G. A. Love and William Johnston sold their said lease and contract of purchase to Edward M. Gault and Benjamin Johnston, of the state aforesaid, who afterwards became associated with Nimrod S. Jarrett, of Macon county, North Carolina, in testing the said property, by which the said Love and Johnston reserved to themselves one-fourth of said property free from the expense of testing the same, and the said Gault, Johnston and Jarrett became liable to pay the said Charles Latimer the purchase money of said property; and whereas, the said Gault, Johnston and Jarrett have discovered a vein of copper ore on said property, which they have opened in two several places, which is considered as

The North Georgia Mining Company *vs.* Latimer.

valuable, and desirous of fulfilling their said contract of paying for the property, have proposed to the other parties interested a participation in the formation of a joint stock company on said property as a final and full settlement of the different interests therein, which was accepted by all the parties thereto on the following conditions, to-wit: They agree to form a joint stock company on the same, with a capital stock of $300,000 00, consisting of thirty thousand shares of $10 00 each, of which the said Charles Latimer is to be the owner of seven thousand five hundred shares, as a full consideration of the price of said land.   The said R. G. A. Love and William Johnston are to own three thousand seven hundred and fifty shares each, being one-fourth of the capital stock, in pursuance of the sale made to said Gault and Benjamin Johnston, and the said William Johnston, one thousand eight hundred and seventy-five shares in addition, purchased from Benjamin Johnston, making, in all, two thousand six hundred and twenty-five shares.   The said Edward M. Gault is to own two thousand eight hundred and twelve and a half shares. The said Nimrod S. Jarrett is to own five thousand six hundred and twenty-five shares, and the said Benjamin Johnston is to own four thousand six hundred and eighty-seven and a half shares, and the said Charles Latimer is to execute to the said company such title as he possesses to the said lot of land, in whatever manner may be advised as legal so soon as the charter can be obtained.

"In testimony of which, all the parties thereto agreeing, have hereunto set their hands and seals, date above written.

(Signed)    "CHARLES LATIMER,    [L. S.]
            "R. G. A. LOVE,       [L. S.]
            "WILLIAM JOHNSTON,    [L. S.]
            "EDWARD M. GAULT,     [L. S.]
            "N. S. JARRETT,       [L. S.]
            "BENJAMIN JOHNSTON.   [L. S.]

"Witnesses:
  (Signed)   "SAMUEL DUNN,
             "W. A. MCCRAULEY."

Complainant was incorporated by an Act of the General Assembly of the State of Georgia, approved March 1st, 1856, with all the powers and privileges usually conferred upon mining companies; its charter will be found on page 442 of the Acts of 1855 and 1856. The capital stock of said corporation was made by said charter to consist of shares of the par value of $500,000 00. It being considered to the interest of complainant to reduce the amount of the capital stock, the General Assembly, by an Act approved February 1st, 1869, diminished the same to the sum of $30,000 00. On account of the heavy taxes imposed, and for other good reasons, the organization of said company was not perfected until the passage of said amendatory Act. On June 23d, 1869, the stockholders in said company met at the town of Dalton, according to previous notice and appointment, for the purpose of perfecting an organization of said company, at which time said stockholders adjourned to the 24th day of the same month. On the day last aforesaid, said company fully organized under said charter by the adoption of by-laws, and by the election of a board of directors, and said directors subsequently elected a president and book-keeper, whereby the organization of complainant became complete. Complainant thus became entitled to a specific performance of the hereinbefore recited contract on the part of said defendant. He, though often requested, has hitherto refused, and does now refuse, to execute a title to said lot of land to complainant. Prayer for specific performance. All discovery waived.

The answer of the defendant, being simply pleading, is omitted. The complainant introduced the following evidence:

1st. The Dalton contract of January 22d, 1856, set forth in the bill.

2d. The Cartersville contract of April 3d, 1856, as follows:

"CARTERSVILLE, GEORGIA, April 3d, 1856. 

"This agreement between the undersigned members of the company interested in lot of land known as number twenty,

ninth district and seventh section of Fannin county, Georgia, witnesseth, that N. S. Jarrett, Edward M. Gault, Charles Latimer, are hereby appointed as agents to sell the property in question under the following regulations, conditions and restrictions—that is to say, they are not to sell said property under the price of $135,000 00, unless further advised; they are to receive as commissions for selling, in the event of a sale, five per cent. on the same sum of $135,000 00; for any sum over that amount, not exceeding $200,000 00, seven and one-half per cent., and for any sum over $200,000 00, ten per cent. out of the sale made, whether in cash, stock, or otherwise, in the same manner as the condition of the sale is made, and in the event of no sale being effected, the company is to bear the expense of traveling and incidental expenses and board, in proportion to the stock owned by each individual in the company, as made known in the articles of agreement entered into at Dalton, on 22d of June last, and each person named therein to receive his proportion of the price, on payment, of said property in like manner, according to the amount of shares held therein, whether in cash, stock, notes or otherwise. It is further understood that in making sales the said agents are to have power to procure the services of any agent or assistants they may deem proper and expedient, for the payment of which, together with any other contingent expenses, in the event of an actual and *bona fide* sale being made, shall fall on the whole company alike, in proportion to their respective shares, provided the net amount of sales, after deducting the same, shall not fall under $135,000 00, but otherwise the agents only are responsible. And further, it is understood and agreed on, that in case said agents shall fail to effect a sale under the present arrangements, and shall be advised and believe that an organization under the present charter would enable them to consummate the same, the parties hereto are to meet at this place, or elsewhere agreed on, either by themselves, or attorney or *proxy*, and organize with as little delay as possible, on reasonable notice being given to the parties by said agents. In pursuance of the above, a power of attorney,

signed by the other members of the company, authorizing and empowering the said agents to carry out the objects set forth in the foregoing agreement, is to be forthwith executed and delivered to said agents.

"In testimony of which, all the parties interested have hereunto set their hands and affixed their seals, date before written.     (Signed in duplicate.)

"N. S. JARRETT,          [L. s.]
"CHARLES LATIMER,     [L. s.]
"EDWARD M. GAULT,     [L. s.]
"BENJAMIN JOHNSTON, [L. s.]
"R. G. A. LOVE,          [L. s.]
"WILLIAM JOHNSTON,   [L. s.]

"Signed, sealed and delivered in presence of us.
(Signed)   "J. A. MADDOX,
           "THOMAS ALLEY, J. P."

3d. The power of attorney executed by defendant to Thomas L. Clingman to sell said lot, with the approval of the other parties interested therein, as follows:

"GEORGIA—FULTON COUNTY:"

"This is to certify and make known to all whom it may concern, that I have this day authorized and empowered Thomas L. Clingman to sell lot of land number twenty, ninth district and second section of originally Cherokee, now Fannin county, Georgia, containing one hundred and sixty (160) acres, (those owning equitable interests therein approving and concurring,) for $100,000 00.   Now I agree, (those owning equitable interests in said lot, as per contract signed and sealed at Dalton, state aforesaid, on the 22d day of January, 1856, approving and concurring therein,) that the said T. L. Clingman is to retain and keep, for his own proper use and benefit, every dollar for which he may sell said lot of land for, over and above $100,000 00, whatever that sum may be.   This is to be in consideration of said T. L. Clingman's services in the premises.

" In witness whereof I have hereunto set my hand and seal, May 22d, 1866.

CHARLES LATIMER, [L. S.]

(Witness)

" J. H. STERCHI, N. P.

" We approve and ratify the above.

(Signed)              " R. G. A. LOVE,

                      " J. A. R. HANKS,

" Administrator of estate of E. M. Gault, deceased,

                      " N. S. JARRETT,

                      " BENJAMIN JOHNSTON,

                      " WILLIAM JOHNSTON,

                           " by Benjamin Johnston."

" We, Benjamin Johnston, for myself, and Benjamin Johnston, as agent for William Johnston, and N. S. Jarrett and J. A. R. Hanks, administrator of the estate of E. M. Gault, and R. G. A. Love, those owning equitable interests in said lot of land, as per contract signed and sealed in Dalton, Georgia, on the 22d day of January, 1856, do agree and approve of the power of attorney to sell said lot of land, number twenty, ninth district and second section of originally Cherokee, now Fannin county, containing one hundred and sixty acres, upon the terms and conditions expressed in said power of attorney, to T. L. Clingman, of Buncombe county, North Carolina.

(Signed)              " R. G. A. LOVE,

                      " BENJAMIN JOHNSTON,

                      " WILLIAM JOHNSTON,

                           " by Benjamin Johnston.

                      " N. S. JARRETT,

                      " J. A. R. HANKS,

" Administrator of E. M. Gault, by R. G. A. Love."

" Witness :

(Signed)   " B. M. BRAWNER,

           " J. H. STERCHI, N. P."

The North Georgia Mining Company *vs.* Latimer.

4th. The charter of the complainant and the Act of 1869, amendatory thereto.

5th. The minutes of complainant, showing its organization on June 24th, 1869.

6th. J. A. R. Hanks, sworn: As the administrator of E. M. Gault, he was invited to meet the other parties in Atlanta, in 1866. He, Jarrett, Love, Benjamin Johnston and defendant, met at the city aforesaid, and the power of attorney to Clingman was executed by defendant. Witness wrote the power, and read it to defendant and the other parties. Defendant signed it without objection or condition other than it expressed. At this meeting the subject of the organization of the company was discussed. The amount of taxation which an organization under the original charter would involve was urged as a reason why an amendment to the charter should be procured and the capital reduced, so that, in the event Clingman failed to sell the property, the company could at once organize without incurring such heavy and onerous taxation. Witness cannot say positively that the defendant was present at the discussion of this question. He thinks that defendant and the other parties were together for several hours. Witness was requested to procure an amendment to the charter reducing the capital stock to $30,000 00, but does not recollect that the defendant joined in said request. Supposes he drew the bill himself. He handed to defendant a written notice of the proposed meeting in Dalton to organize the company. This notice was handed to defendant on June 12th, 1869, and the meeting was on the 23d of the same month. Witness had other interviews with the defendant. Never, at any time, heard him say or intimate that any fraud, mistake or omission had incurred in the execution of the Dalton contract of January 22d, 1856. Since the organization of the company at Dalton, on June 24th, 1869, there has been no regular meeting of the members or directors. E. M. Gault died in February or March, 1866.

The complainant closed.    The defendant introduced the following testimony:

1st. An instrument, as follows:

"Whereas, R. G. A. Love, of Haywood, North Carolina, hath this day, 17th of March, 1854, made known a desire to enter upon a lot of land owned by me, which lot of land is known as number twenty, district ninth, section second, originally Cherokee county, Georgia, and afterwards Gilmer county, on the waters of Fighting Town creek, and test for minerals, with a condition of purchasing the same:

"These are therefore to certify and make known to all whom it may concern, that I have given, and by these presents do give, the said Love privilege to do so, and he is to prosecute the test vigorously as soon as he can do so with safety to himself, owing to litigation being going on at this time about said lot of land, with these conditions:

"After the said Love gets possession he is to prosecute the test vigorously and in good faith, and he is to have a reasonable time to complete it in, and when completed, if the lot of land aforesaid should prove to have and contain as valuable a vein of copper ore as the average mines in Ducktown, Polk county, Tennessee, the said Love agrees to pay me the sum of $50,000 00 for it, and I agree and hereby bind myself, my heirs, executors and administrators, to make him or his heirs a good and sufficient deed of conveyance for the same, with everything appertaining to it.    And if the lot of land should, after it is thus tested and developed, prove to have a better and more valuable copper vein than the average mines in Ducktown, Tennessee, now open and in operation, the price of the mine is to be raised in proportion as its value is over the value of the average mines in Ducktown, Tennessee, and if, after being tested and developed as aforesaid, it should turn out not to have and contain as valuable a vein of copper ore as the average copper mines now opened and in operation in Ducktown, Polk county, Tennessee, the price of the said lot of land is to be reduced in proportion to its want of value or falling off, compared with them.    When the mine is thus tested and its

price fixed, the said Love agrees either to take it at the price that may be agreed upon, or go off of it, lose his labor, and give me full possession of the same. If the said Love and myself cannot agree upon the comparative value of the mine, we agree to leave it to disinterested, scientific men, such as may be agreed upon by us. And if he agrees to take it, he is to pay me the full amount in twelve equal monthly installments, with good and sufficient security to his notes, that he faithfully performs and meets the payments. The title of the said lot of land is to remain in me until each and all the installments are paid, then I am to execute the title to the said Love as aforesaid.

" In witness whereof I have hereunto set my hand and affixed my seal, on the day and date above written.

  (Signed)    " CHARLES LATIMER, [L. s.]
         " R. G. A. LOVE,     [L. s.]

"Attest:
 (Signed)   " B. F. MOULDEN."

2d. Charles Latimer, the defendant, next offered himself as a witness. It was objected to his competency that E. M. Gault, one of the parties to said Dalton contract of January 22d, 1856, and one of the stockholders of complainant, was dead. The objection was overruled, and complainant excepted.

He testified substantially as follows: At the time he entered into the contract of 17th of March, 1854, with Love, he did not know William Johnston. Does not know how Gault, Benjamin J. Johnson and Jarrett acquired an interest in said contract. Never consented to take them for the purchase money mentioned in said contract in lieu of Love. Was informed by Love at the time of said contract that a man by the name of Nimrod S. Jarrett set up some sort of a claim to said land. Was informed by Gault, Benjamin Johnston and Jarrett, that they had tested said land in two places and had discovered copper ore, and that they thought the mine rich and valuable. Defendant never made any objection nor con-

sented to the assignment of the contract with Love to said Gault, Benjamin Johnston and Jarrett; he was never consulted with reference to the same. After the copper ore was discovered, Benjamin Johnston and Gault invited witness to meet the parties at Dalton on January 22d, 1856, to arrange and settle the various interests under said contract with Love. He met the appointment, taking his little son with him. On the way to Dalton, his child was taken sick, threatened with pneumonia, and after their arrival at that point, seemed to grow rapidly worse. He met at Dalton Love, William Johnston, Gault, Benjamin Johnston and Nimrod S. Jarrett. The discovery of copper on the lot had rendered it, as all supposed, very valuable, but he had always had such an opinion of the property. Various suggestions were made and propositions submitted, some stating that it was the custom of the country in the mining region for those who made tests and discovered copper to have a one-half interest in the land. Defendant would not consent to this suggestion. He insisted, as his ultimatum, that he must receive $50,000 00 for the lot; also, that under his contract with Love, they were not entitled to anything for testing. This discussion continued until a late hour in the night. His son was so sick that he felt great uneasiness about him. He was passing frequently to and from his son's room whilst the discussion was going on. Finally, at a late hour of the night, some one proposed the formation of a joint stock company as the best way of settling the various interests. This was consented to, and William Johnston was appointed to draw up the agreement. He performed this service, and read the agreement in an audible and distinct tone to the parties before mentioned, after which it was signed. After the signatures were attached, some one present said something about each one of the parties taking a copy. On the next morning some one handed to him a copy of the contract. It was late at night when said contract was signed; in fact, it was about four o'clock the next morning, and witness' mind was much disturbed during the whole discussion on account of the condition of his son. He insisted, as his ulti-

matum, that he must have $50,000 00 for the land, but the other parties insisted that they did not then have the money. He refused to yield this point, and it was finally the understanding of all the parties that he was to have the $50,000 00 certain, and as they were not then able to pay that amount, he urged that he ought to have something for the delay which had already taken place, and which would take place, in the payment thereof. It was then agreed that he was to have one-fourth of the stock over and above the $50,000 00 to remunerate him for the delay. Witness insisted, from the beginning unto the end of said discussion, that he was entitled to stand upon said contract with Love, and that said $50,000 00 was to be paid out of the first stock of the company sold, and enough stock was to be sold to pay said sum, even if it took all of it. He did not observe that this stipulation was not in said contract when he signed it. Did not read the copy furnished to him until the next day, just before his arrival at the town of Cartersville, at which place he intended to stop to take his sick son to his daughter's house. He, then, for the first time, discovered the omission. He did not return and notify the other parties of the mistake, for the reason that when he left Dalton they had their horses saddled, were cloaked and about to start. Knew where each and all of said parties lived, but never wrote to them, or either of them, about any mistake or error in said contract. Met said parties again at Cartersville, on April 3d, 1856. Went with Gault and Jarrett to Savannah to sell said land, under the Cartersville agreement. Saw William Johnston at Morganton, and saw all the parties at the Atlanta meeting, in May, 1866, but never, at any time or in any way, said or intimated to said parties, or either of them, that there was any mistake or error in said Dalton contract. He was present at the Cartersville meeting, on April 3d, 1856, and signed the contract of that date. Refused to accept the charter, because it fixed the capital stock at $500,000 00, and this would make the taxes too onerous. It was therefore agreed to sell the land without an organization under the charter, if it could be done,

in order to save taxes. Witness accepted the agency under that agreement, and went to Savannah in company with Gault and Jarrett, and remained there eight or ten days, trying to sell said land. Attended the meeting at Atlanta in May, 1866. Did not consent to any amendment of said charter, or to any organization thereunder. Has been in very feeble health for fifteen or twenty years. Quit business some fifteen years ago on account of ill health. Rented the land in 1864 to one Phillips for one year for one-half the profits. Received as rent for that year, $2,500 00. Is now seventy-five years of age. Believes the mine to be very valuable. No certificates of stock were ever issued or put on the market that witness ever heard of, and he cannot, for this reason, give any opinion as to the value of the stock. Cannot say that any fraud was practiced on him at the time of his signing the Dalton contract, or that William Johnston read it differently from what was written therein, but thought it contained his terms, as heretofore stated, or he would not have signed it. Did not give notice of any error or mistake in the Dalton contract, because he came to the conclusion in his own mind that they intended to practice a fraud on him at the time it was executed. He simply determined to make no deed until he was paid his $50,000 00. At the Cartersville meeting, the parties notified defendant that they had appointed Gault and Jarrett to go to Savannah to sell the land, about which he was not consulted, though he was there. Defendant told them that if they did not sell it to his notion he would not make a deed, and they then appointed him in connection with said Gault and Jarrett.

The defendant closed. The complainant introduced the answers of R. G. A. Love to a set of interrogatories substantially as follows:

After examining the lot in controversy he thought there was a fair chance of finding copper upon it, and learning that the defendant was the owner thereof, he went to see him at his house in DeKalb county, Georgia. He stated to the defendant that it would require the expenditure of a good deal of money

and time to make a satisfactory test of the resources of the lot, and that if the defendant would satisfy him for making the test, he and his partner, Mr. William Johnston, who were engaged at that time in hunting for copper, would make a search for the same. After some discussion the contract of lease was entered into. He has not a duplicate of said contract. When it was satisfied by the agreement entered into at Dalton, he lost sight of said paper, but does not remember whether it was handed to defendant, or destroyed, or what became of it. When he returned from DeKalb county he found one Nimrod S. Jarrett in possession of said lot, under claim of title from some other person, and fearing that he would be put to great trouble in getting possession of the same, he sold his contract with defendant to Gault and Benjamin Johnston, who afterwards became associated with Jarrett. They went to work on the lot and after a very thorough examination found copper on it in two places. Was present at the Dalton meeting. The parties wished defendant, William Johnston and witness to take steps to ascertain the value of the land so that they could proceed to pay for it upon the terms provided in the aforesaid lease and obtain a title. Some time was consumed in discussing how this value should be arrived at. A proposition was then made that a joint stock company be formed with a capital of $300,000 00, divided into thirty thousand shares of $10 00 each, and that the defendant receive a certain number of shares as a full and final consideration for the land. This suggestion, after much discussion, was acquiesced in by all the parties, each agreeing to take his interest in stock. A contract to the above effect was consequently drawn and signed by all the parties. The land, exclusive of its mineral resources, is not worth more than $100 00. It was by the labor and expense of Gault, Jarrett and Benjamin Johnston, under the contract of William Johnston and himself, that its mineral wealth was developed. On the first occasion on which he met defendant, after William Johnston and witness had sold their contract of lease to Gault and Benjamin Johnston, he mentioned this fact, and also told him that Gault

and Benjamin Johnston had associated Jarrett with them, and in this way had settled his claim to the land. Defendant expressed himself well satisfied with the arrangement. The company instructed Gault, defendant and Jarrett, to take steps to procure a charter. After our first meeting at Dalton, we met at Cartersville in the month of April following. We failed to organize under the charter which the General Assembly had granted, for the reason that the market value of copper property was greatly reduced, and for the additional reason that we would be compelled to pay taxes on a valuation of $500,000 00, the amount of the capital stock. The company did not work the mine for the reason that they desired to sell it, and for the further reason that the mine as developed showed very well, and they feared by working, it might not show so well further down. These were substantially the views of each member of the company at every meeting at which the matter was discussed. Never heard the defendant say anything about an omission through fraud or mistake in the written agreement made at Dalton; never heard that he made any such pretensions until after this suit was brought. Saw him frequently after the Dalton meeting; was present when the power of attorney from defendant to Clingman to sell said property, was executed. Defendant agreed to sign said instrument provided the other parties would give him an instrument approving his action in the premises. He stated that his obligation was out to make a title to the company when organized and that the parties interested must approve his power of attorney to Clingman. We agreed to do so. Such an instrument was accordingly executed and our approval placed thereon at the request of defendant.

Was present when the company organized under the Act of incorporation and the amendment thereto. Three-fourths of the entire stock was represented. William Johnston was not present when the contract of lease was made by defendant, but he thinks his name was inserted in it. If it was not, it was certainly an oversight, because witness and defendant both understood that Johnston was interested in it. When

the original contract with defendant was canceled, and the Dalton agreement entered into, it was either destroyed or handed to defendant. The Dalton contract was carefully read over, clause by clause, in the presence of all the parties, before it was signed. The stock of the company was supposed by us to be worth $300,000 00. The truth is, we all felt like we had made a fortune; we, by testing it, and defendant, by having it tested by us. The defendant received his pay in the labor and expense expended by the other parties on the property in testing it, in taking up the claim of Jarrett, and in canceling the contract which William Johnston and witness had on him. The amendment to the charter was procured by Hanks, the administrator of Gault, at the instance of all the parties interested. He was so authorized at the Atlanta meeting. The defendant was present at said meeting. If he was not present at the time the agreement as to the amendment of the charter was entered into, witness does not know the reason of his absence.

Also, the answers of William Johnston, of Benjamin Johnston, and of Nimrod S. Jarrett, to sets of interrogatories. They substantially corroborated the testimony of Love.

The jury found for the defendant. The complainant moved for a new trial upon the following grounds, to-wit:

1st. Because the court erred in allowing the defendant to testify, Edward M. Gault, one of the parties to the contract executed at Dalton, on January 22d, 1856, being dead.

2d. Because the court erred in refusing to charge the jury as follows: "When a contract for the sale of land is in writing, is fair and just in all its parts, is certain, is for an adequate consideration and capable of being performed, it is as much a matter of course for a court of equity to decree a specific performance of it, as it is for a court of law to give damages for it in other cases."

The motion was overruled, and complainant excepted.

W. H. DABNEY; J. A. R. HANKS, for plaintiff in error.

J. M. CALHOUN & SON; L. E. BLECKLEY, by N. J. HAMMOND, for defendant.

McCAY, Judge.

1. My brother Trippe and myself join with the Chief Justice in holding that the death of one of these contractors does not exclude Mr. Latimer as a witness. In the first place, the party to the suit is a corporation, and the death of one of its members is not within either the letter or the spirit of the exceptions in the evidence Act of 1866. Nor, as we think, does the case, even were the original contractors parties, come within the spirit of the exceptions. Here are several of the original contractors living who may and do confront Mr. Latimer, and the mischief intended to be guarded against by the exceptions, does not at all exist.

2. It has long been the settled rule, both in this country and in England, that if a contract for land be in writing and be fair in all its parts, certain and for an adequate consideration, it is as much a matter of course for equity to enforce it as it is for a court of law to give damages for it in other cases. It is not a question of discretion. The party seeking redress has *a right*, and it is the duty of a court of equity to enforce it by decree: It is only when the contract is unfair or uncertain, or the price inadequate, that the discretion to refuse arises: Code, 3190; See *Chance vs. Bell*, 20 *Georgia*, 142, where the rule is fully and strongly stated.

3. In this case the contract is in writing, and whilst there is some evidence, to-wit: that of Mr. Latimer, of fraud, yet we doubt if, under the whole evidence, that had much weight with the jury. It seems to us clear that the verdict turned on the charge of the court, "that the jury had a discretion to decree or refuse to decree specific performance." The judge refused to charge, on request, the principle we have alluded to. In the argument here it was admitted that this was the rule in the cases it covers. But it was contended that the case at bar did not authorize the charge, because the facts

showed there was no consideration, or, at best, a very inadequate consideration. It was contended that the Dalton contract, the foundation of the bill, was without consideration, that the land belonged to Latimer at first, and that, in effect, this agreement was an agreement to give to the plaintiff three-fourths of his own land. The line of argument by which this strange conclusion is arrived at strikes me with astonishment. It is based on the assumption that if A. has a parcel of land and contracts with B, that if he, B, will, at his own risk, develope a valuable mine upon it, he, B, may have three-fourths of it, the agreement is without consideration. It is said the land and all that is on it belongs to A, and that, as by such contract, he only retains one-fourth of it, he gives the other three-fourths of it away. But those who reason thus forget that the minerals, though there, were hidden, and worthless because hidden; that it cost money, labor and *risk* to find them, and that the land gets its real value from the finding. There is just as much logic in saying that if one should agree to give one-fourth of his land to one who should, at his own expense, clear it, this would be a gift. To my mind it is very clear that if I contract with a man to give him three-fourths of a tract of land if he will go upon it and lay bare a valuable mine, by his skill, labor and capital, I only give a fair *quid pro quo*. My land is of but little value. I am not willing to take the risk of expending money in sinking shafts, etc., and if I can get a man to take this risk, and to expend perhaps three times as much as my land is worth, I to run no risk, and he to lose his money if he fails, I may do a very good thing for myself. That his skill, labor and capital, in fact, do, if he succeeds, render my land more valuable in the market than it was before, is unquestionable, and it seems to me absurd to say, if I make such a contract, that it is without consideration.

It is said that in this case it was the express contract that Love was to test the land at his own expense. Certainly. And it is that very stipulation which makes the consideration, or, at least, a large part of it. Love was to run *all the risk*.

Had the agreement been that it was to be at Latimer's expense, Love's right to remuneration would be only for his labor or skill. But just because Love *was* to bear all the expense and take *all the risk*—just because, if there was a failure, Love was to lose his time, labor, skill and money, and Latimer to have the land *as it was before,* just for this reason, it would be fair, and just, and reasonable, that if Love *should* succeed, and by his risk and labor and skill, make Latimer's land, with no work or labor of his own, of great value in the market, Love should reap a large share of the profits of the enterprise. Why should Love and his associates go to work to develop Latimer's land? Why should *they* spend their time, money and skill upon it, if, when the prize was won, they were to turn the land over to Latimer, or pay him *the value of it?* Such conduct would be childish, an act of pure benevolence, that among business men would be laughed at as folly. On the other hand, I doubt if there be a man in Georgia who owns a lot of land, supposed to have minerals upon it, but which requires an outlay of $2,500 00 to test, who would not be glad to give three-fourths of it to one who, by his labor, skill and investment upon it, would make it as valuable in the market as the Ducktown copper mines. And it is equally clear that there are very few men of any experience in such things who would be willing to risk $2,500 00 in testing a lot, even under an agreement to get three-fourths of it if the mineral was found. The truth is, that such things are so uncertain, that the risk of so large a sum ought to insure a very large reward upon success. The true rule of division between the parties, on equitable principles, by which both would get equity, would be that the owner of land should have such a share as his investment, to-wit: the value of his land before testing, with no risk of the loss of anything, is proportioned to the time, skill and money spent by the other party, with the risk of the loss of all. Whether this is one-half, one-fourth, one-tenth, or any other fraction, would depend on circumstances, though, ordinarily, one-fourth would, in my judgment, be a good share for the land

owner. It does not appear positively what the parties supposed a lot equal to the Ducktown mines would be worth. The Love contract fixed, however, upon $50,000 00 as Mr. Latimer's price for the land if it should be equal to those mines. And as all parties seem to have agreed that Mr. Latimer was entitled to his $50,000 00, and as they also agreed the land was worth $300,000 00, it would seem to follow that $300,000 00 was what they supposed the land had been counted worth at the time the Love contract was made, should it turn out equal to Ducktown; $50,000 00 is one-sixth of $300,000 00. And I do not believe there is a man in the state who would not be glad to give five-sixths of any undeveloped lot to one who should *prove it,* by a test, at his own expense, to be equal to the Ducktown mines.

When, therefore, these parties met at Dalton, in 1856, it is a great mistake to say that this was Latimer's land. Under the contract with Love the plaintiffs had acquired an equitable interest in it. They had the *right,* fairly acquired and honestly paid for, under a written agreement, to buy it at a price to be fixed by its relative value as compared with Ducktown. Had there been no Dalton contract, and this been a bill to compel the specific performance of the Love contract, how would the matter stand? Love was to test the land at his own expense. If he found copper he was to have a right to buy for $50,000 00, in case he had found a Ducktown, and *for as much less as the mine should be of less value than the Ducktown.* The parties would, *without the Dalton contract,* have a right to a decree on the payment by the complainant of a sum bearing the same relation to $50,000 00 as this lot bears to Ducktown. When they met at Dalton, the very first thing to settle was, what was the value of the new discovery as compared with the Ducktown mines? All parties seem to have agreed that the testing was a success; that the plaintiffs, by their skill, labor and expenditure, had developed a valuable property out of a lot of land of but trifling value. It seems to have been agreed all round that $50,000 00 was the price to be paid. Why? Because that was the value

of the *land*? Evidently not. The very fixing of this price shows that they considered it equal to Ducktown, and, so considering, that it was worth $300,000 00. Yet, by common consent, and by the written agreement with Love, Love and his associates had the *right* to buy for $50,000 00. It follows, it seems to me, incontestibly, that they all, including Mr. Latimer, recognized that the meaning of his contract with Love was, that if a valuable mine was found Love should have the right to buy it for one-sixth of its value; that thus, and thus only, was Love to be compensated for his labor, skill and *risk of the money* necessary to test it.

As I have said, I do not think this an unfair, but a just and reasonable contract, one that almost any owner of undeveloped mineral land would be willing to make, and one that but few speculators would care to go into on the other side. Latimer knew, and Love knew, that if a Ducktown mine was found $50,000 00 was but a small fraction of its value. But they also knew that there were large chances that Love would lose his time, his labor and his capital. No one who has ever heard or read of the uncertainties of such enterprizes can hesitate as to which party, under this Love contract, was taking the greatest risk. By the original contract, therefore, it is plain that if a mine of value was found Love had a right to buy the land at far less than would *then* be its value, and this for the plain reason that in such a case it would be his skill, labor and risk of capital that gave it value.

Assuming that this was the state of the case, how can it be said to be unfair to Mr. Latimer? How can it be called a foolish contract, or one not founded on an adequate consideration, if he agreed to take for his $50,000 00 one-fourth of the land, or one-fourth of the stock of a company formed by the owners of the land? If they were right in their estimate, he got $75,000 00 instead of $50,000 00 for his land; and if they were not right in their estimate, *he was not entitled to* $50,000 00. That sum was to be lessened according to the failure of the mine to come up to Ducktown. It was only on the presumption that the land was worth $300,000 00 that

he was to get $50,000 00 for it. It seems to me absurd to say that this is not a fair discharge of the Love contract, and that, instead of $50,000 00, Mr. Latimer only gets stock, which is mere paper, and may be, perhaps, is worth nothing. If it be worth nothing, it is because the land is worth nothing. He was not, by his contract, to have $50,000 00 at all events, but only if the land is equal to Ducktown. If it be equal to Ducktown—if it be worth a sum which would entitle him to $50,000 00—his one-fourth of the stock is worth $75,000 00. True, it is not cash, and perhaps it may be a long time before he will get $75,000 00 for it, but if so, it will be only because it is not a Ducktown copper vein—only because he and they were mistaken in supposing he was entitled to $50,000 00. He gets by the Dalton contract more than his contract with Love called for. He gets one-fourth instead of one-sixth of the land, and if he saw fit to take his $50,000 00 in stock, based upon the same estimate of the value of the land that fixed $50,000 00 as his interest in it "after the mine was found," is that unfair? I do not think so, and a jury might well think this Dalton contract was a fair and just one, based on an adequate consideration, according to the evidence of Mr. Latimer himself. He was the owner of a tract of land of but little value, save upon the idea that it contained a copper mine. It would cost a good deal to test it. As all experience proves, money thus spent is generally thrown away, as valuable copper lots are very, very scarce. Mr. Love was ready to take the risk. *He* would spend his time, his labor and his money. If there was a failure, the loss was to be his, and his alone. Latimer ran no risk. It was but fair that the man who ran the risk should, if successful, get the largest share. They fixed Ducktown as the standard. If the test was a failure, Mr. Latimer lost nothing; he still had his land. But Love lost, as the proof shows, $2,500 00. On the other hand, if a Ducktown mine was the result, Mr. Latimer's land, worth almost nothing before the test, now made him a rich man. He got $50,000 00 for it.

The Dalton contract is based on the assumption that a new

Ducktown was found. On that assumption, $300,000 00 is low for the land, and $75,000 00 in stock is a fair substitute for the $50,000 00. If the stock is not worth the money, it is not a Ducktown. Just as much as it falls below Ducktown, $50,000 00 is too much for Mr. Latimer's interest. He does not get $50,000 00 for his land in cash, which he was to get if it proved a Ducktown; but he does get $75,000 00 in stock, which is worth $75,000 00 if it is a Ducktown. By the very terms of his contract with Love, he was to sell his land at a price to be proportioned according to its approach to Ducktown. He and they, at Dalton, evidently believed they had got a Ducktown, since it was understood that he was entitled to $50,000 00. If he sold at all, *some* comparison with Ducktown was to be made. They all agreed it was equal, and fixed $50,000 00 as the price. If they were right, his stock is worth more than $50,000 00. If they were not, then $50,000 00 is too much. In other words, the Love contract is itself dependent on the value of the land, and the Dalton contract does nothing but keep up the same idea. Mr. Latimer, instead of $50,000 00 in cash, was willing to take $75,000 00 in stock, in a company which had a mine equal to Ducktown. If this be so, he is not hurt. If it be not so, and the land be worthless, Love and his associates have lost more than he has. As a matter of course, in saying so decidedly that this was a fair contract, we only give our opinion, and the reasons for it. We do not intend to dictate to a jury who may think otherwise. We express this opinion because the effect of the refusal of the judge to charge as requested was, in effect, the expression of a different opinion.

To conclude, then, upon this point, my brother TRIPPE and I think a jury might well consider that this Dalton trade was not only founded on a valuable consideration, but was in fact only putting into another form the Love contract which nobody pretends was anything but fair and reasonable.

We think, therefore, the court erred in refusing to charge "that it was a matter of course for equity to decree specific performance of a contract for the sale of land if it was in

The North Georgia Mining Company *vs.* Latimer.

writing and was fair and for an adequate consideration," since there was evidence to justify and require it. For this reason we think there ought to be a new trial. We do not think the jury could, under the evidence, have given much weight to the evidence of imposition or fraud in the execution of the Dalton contract. It is not a very reasonable story, to say the least of it. It is contradicted by everybody else, and it is utterly inconsistent with the frequent acts of Latimer in subsequent ratification and approval of it. As to the variance between the corporation as actually got and that agreed upon, that is a small matter—more a matter of form than substance—and we cannot suppose the verdict was based upon that. Mr. Latimer seems always to have been perfectly willing to take his $50,000 00 in stock, provided only the stock was worth what it would be if they had in fact found a Ducktown; and had they found a purchaser, even at a less rate than $300,000, it is quite plain he would have been satisfied with his $75,000 in stock.

Judgment reversed.

TRIPPE, Judge, concurred, but furnished no written opinion.

WARNER, Chief Justice, dissenting.

This was a bill filed by the complainant against the defendant, praying for a specific execution of an alleged contract for the sale of a lot of land. The defendant resisted the complainant's right to a specific execution of the alleged contract on the ground of mistake and fraud in the procurement of it, and because the consideration was inadequate. On the trial the jury found a verdict for the defendant. A motion was made for a new trial on the several grounds set forth in the record, which was overruled, and the complainant excepted.

It appears from the evidence that what is called the Dalton contract was made between the defendant and six other persons, one of whom was Gault, who was dead at the time of the trial. All the parties were corporators, and named in the Act of incorporation as such. The other corporators, except

Gault, testified as to what took place at the time the Dalton contract was executed, which was prior to the act of incorporation; and the question is, whether Latimer, the defendant, was a competent witness as against the living corporators, Gault being dead. Although one of the joint contractors may be dead, still, when they have been all incorporated into a body politic, as in this case, and have the legal capacity to sue the defendant as a complainant, and as the living corporators were competent witnesses against him in favor of the complainant, the defendant was also a competent witness to confront the living witnesses who were sworn in favor of the complainant. To hold otherwise would be contrary to the true intent and spirit of the Act of 1866, defining the competency of witnesses. The facts of this case do not bring it within the exceptions of that Act, and there was no error in admitting the defendant to testify against the living parties to the contract who were sworn for the complainant.

There was no error in the refusal of the court to give in charge to the jury the first head-note in the case of *Chance vs. Beall,* 20 *Georgia Reports,* 142, as requested, in view of the facts of this case, to-wit: "Where a contract for the sale of land is in writing, is certain and fair in all its parts, is for an adequate consideration and capable of being performed, it is just as much a matter of course for a court of equity to decree a specific performance of it as it is for a court of law to give damages for it in other cases." This request was properly refused, because it did not state that it was *discretionary* with a court of equity to decree a specific performance of the contract as is stated in the opinion of the court in that case, and because it was not the law applicable to the facts of this case, as declared by the 3190th section of the Code, to-wit: "Mere inadequacy of price, though not sufficient to rescind a contract, may justify the court in refusing to decree a specific performance; so, also, any other fact showing the contract to be unfair, or unjust, or against good conscience."

In looking through the record of this case I find no legal errors alleged, except such as are merely *colorable* for the pur-

pose of having the verdict of the jury set aside, on the ground that it is contrary to the evidence and the weight of the evidence. The main object of the plaintiff in error is to get rid of the verdict and obtain a new trial, as is generally the case with the losing party. In my judgment, the case was fairly submitted to the jury under the charge of the court, and I cannot say that the verdict was wrong in refusing to decree a specific performance of the contract, under the evidence disclosed in the record. The defendant contracted with Love to test the lot of land for minerals at his own expense, and if it proved to be as valuable for copper ore as the Ducktown mines, then the defendant agreed to sell the lot to him for $50,000 00. Love tested the lot, said it was valuable for copper ore, but never paid or tendered in payment to the defendant the $50,000 00, or any part thereof. But it is said that because Love, with whom the defendant made the contract, thought proper to associate with him other parties in testing the lot, and because those other parties and the defendant met at Dalton and agreed to form a joint stock company and divide the defendant's land into stock without paying him the $50,000 00, that he has been paid for his land in the stock which the joint stock company issued to him. It may be true that the defendant received, *nominally*, more than $50,000 00 in the stock of the company for his land, but I fail to perceive that he has ever received anything more substantial for it than the company's stock.

It is claimed by Love and his associates that they have expended $2,500 00 in testing the land for minerals, and, therefore, had acquired an interest in the land under the contract with the defendant; whereas, the truth is, that under the Love contract, the land was to be tested at his own risk and expense, and if found valuable, he had the right to purchase the land of defendant at the price fixed, and agreed either to do so or to go off the land, lose his labor, and give possession of it to the defendant. The fallacy in the argument for the complainant consist in *the assumption* that Love and his associates, under the contract with defendant, acquired an interest in *his*

land by expending money in testing it for mineral ore. The contract was that Love was to test the land at his own cost, with the privilege of purchasing it at $50,000 00, and if he did not do so, was to go off the land and lose his labor. It is not pretended that Love and his associates have ever paid the defendant the $50,000 00, or any part thereof, for his land, except in stock, as before stated. If the contract between Love and the defendant had been that Love was to test the land for mineral ore, and if found valuable, the defendant was to convey to him an interest in the land, and Love had done so, and expended $2,500 00 in testing it for the benefit of himself and defendant, then he would have had an interest in the land; but that was not the contract. Love was to test the land at his own expense, with the right to purchase it, if found valuable, for the sum of $50,000 00, and the defendant was bound to make him a deed when he paid him that amount of money for it, and if Love did not do so, he was to go off the land and lose his labor in testing it. When the complainants and defendant met at Dalton and formed the joint stock company, the complainants had just about the same interest in the defendant's land, under the Love contract, and the same *assurance* in pretending to claim any interest in it, as a certain notorious character had when he took our Savior up into an exceeding high mountain and showed him all the kingdoms of the world, and promised to give it all if he would fall down and worship him. But the joint stock company was formed with a capital stock of $300,000 00, all based on the defendant's land, and nothing else. The stock was divided into shares of $10 00 each and distributed amongst the parties, the defendant receiving seven thousand five hundred shares thereof, in full consideration of the $50,000 00 that was to be paid him for his land, under the Love contract. If the seven thousand five hundred shares of stock in this joint stock company, paid to the defendant for his land, was based on any other valuable consideration, either in money or property than the defendant's *own land*, it has escaped my obser-

vation, and I presume it escaped the observation of the jury on the trial of the case.

In view of the evidence contained in the record, the practical effect of the Dalton contract, so far as the payment for the defendant's land is concerned, is very much like the old game of "Heads, *I* win; tails, *you* lose."

I am of the opinion that the judgment of the court below should be affirmed.